**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MELISSA DELVAL** and | ) |
| **MICHAEL FLYNN, W/H,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    2:20cv1839 |
| | )    **Electronic Filing** |
| **TOWN OF MCCANDLESS**, | ) |
| **DAVID DISANTI** and **JEFFREY BASL** | ) |
| | ) |
| Defendants. | ) |

## <u>OPINION</u>

Melissa Delval ("Delval") and Michael Flynn ("Flynn"), husband and wife, commenced this employment suit against Delval's current employer, Town of McCandless ("McCandless"), Lieutenant Jeffrey Basl ("Lt. Basl"), and former Chief of Police, David DiSanti ("Chief DiSanti"), pursuant to Title VII, the Pennsylvania Human Relations Act ("PHRA"), and state law causes of action alleging assault and battery, negligence, intentional infliction of emotional distress, negligent hiring and retention, and loss of consortium.  Presently before the court are defendants' motions for summary judgment.  <u>See</u> Doc. Nos. 85 and 87.  For the reasons set forth below, Chief DiSanti and Lt. Basl's motion will be granted in part and denied in part and McCandless' motion will be granted in part and denied in part.

On October 30, 2020,[1] Delval and Flynn, husband and wife, commenced this action by filing a civil action complaint (the "Civil Complaint") against Defendants Chief DiSanti, Lt.

---

[1] In several places throughout the record, both parties incorrectly cite that plaintiffs' civil action complaint was filed on October 20, 2020.  However, plaintiffs' complaint was filed on October 30, 2020.  <u>See</u> Notice of Removal, Doc. No. 1.

Basl, and McCandless in the Court of Common Pleas of Allegheny County, Pennsylvania.  On November 27, 2020, the action was removed to this court as it has federal question jurisdiction based upon the federal civil rights claims asserted, 28 U.S.C. §§ 1331 and 1441(a), and supplemental jurisdiction over the asserted state law claims, 28 U.S.C. § 1367(a).

The Civil Complaint includes nine counts alleging: Count I – gender disparate treatment, hostile work environment, and retaliation claims in violation of the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 ("PHRA") against all defendants; Count II — gender disparate treatment, hostile work environment, and retaliation claims in violation of Tile VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000, *et seq.* ("Title VII") against all defendants; Count III – assault and battery claim against Chief DiSanti; Count IV – negligence claim against McCandless; Count V – negligence claim against defendants Chief DiSanti and Lt. Basl; Count VI – intentional infliction of emotional distress claim against McCandless; Count VII – intentional infliction of emotional distress claim against Chief DiSanti and Lt. Basl; Count VIII – negligent hiring/retention of employee claim against McCandless; and Count IX – loss of consortium claim by Flynn against all defendants.

On April 28, 2023, defendants filed motions for summary judgment relating to the counts alleged in the Civil Complaint as they pertained to each defendant.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Marten v. Godwin,

2

499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party.  Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts,

are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiffs establishes the background set forth below.  Plaintiff Delval was sworn in as a McCandless police officer on August 7, 2017. At all relevant times, Delval was married to Flynn.  Flynn works as a police officer for the City of Pittsburgh; he has never been employed by McCandless.

At the time Delval was sworn in, defendants Chief DiSanti and Lt. Basl were also employed as McCandless police officers.  Chief DiSanti was the McCandless Chief of Police, a role that he had held since 2016.  Lt. Basl was initially hired by McCandless in 1994 and subsequently earned the rank of lieutenant.  At all relevant times, both Chief DiSanti and Lt. Basl were in supervisory roles to Delval.

Delval alleges that she was subjected to constant, persistent and systemic sexual harassment and discrimination, the majority of which came from Chief DiSanti and Lt. Basl, from the very start of her employment with McCandless.  In fact, during Delval's swearing in ceremony, former McCandless councilman Ralph LeDonne commented on Delval's appearance,

referring to her as "the winner of the Jennifer Aniston look-a-like contest."  This comment was made publicly in front of numerous citizens and McCandless officials.

In May of 2018, the president of the Town of McCandless Council, Carolyn Schweiger ("Schweiger"), received an anonymous letter advising "[Schweiger] of the situation with the McCandless Police Department."  <u>See</u> Doc. No. 96, Pl. Appx. at 105.  The letter addressed a number of alleged issues stemming from Chief DiSanti's management (or mismanagement) of the department, including that "[i]n the 18 months of Chief DiSanti's reign, the morale in the department is the lowest it has ever been, while the favoritism is at its greatest."  <u>Id.</u>  The letter closed by stating, "[t]he lack of signatures is due to sure retaliation by Chief DiSanti."  <u>Id.</u>

Shortly thereafter, Schweiger and former council member Kim Zachary ("Zachary") met with Chief DiSanti at a local coffee shop to discuss the letter.  According to Schweiger and Zachary, Chief DiSanti flatly denied all allegations against him and was unwilling to engage in any substantive discussion regarding the alleged issues within the police department.  Instead, Chief DiSanti fixated on ascertaining the author's identity stating that he wanted to launch a full investigation, strongly advocating for the letter be fingerprinted.  Chief DiSanti also demanded that he take physical possession of the letter in order to "study" the writing, stamp, and any other potentially identifying characteristics.  No meaningful discussion of the department's alleged morale issues took place and the conversation eventually shifted to other police matters, such as planning a "Coffee with the Cops" event.  No further investigation was undertaken in response to the anonymous letter.

**<u>Delval's letter</u>**

On October 21, 2018, Delval sent a six-page letter to McCandless Town Manager Toby Cordek describing the "inappropriate, unprofessional, and considerably harassing behavior" that

Delval was experiencing.  <u>See</u> Doc. No. 96, Pl. Appx. at 66.  The letter directly accused Chief DiSanti and Lt. Basl of sexual harassment and outlined a number of occurrences as support thereof.

First, Delval's letter expressed that she received inadequate field training due to her gender.  Delval completed field training from August 8, 2017, to October 14, 2017, primarily under the direction of certified training officer David Martin ("Martin").  It was implied to Delval that she had to be assigned to Martin because he was in a "committed relationship," and any other male training officer would have been incapable of maintaining a professional relationship with Delval.  Delval also insisted that she was denied certain opportunities during her training period that were freely given to her male counterparts, including the execution of arrests.

Second, the letter accused Chief DiSanti of "incessantly" summoning Delval to his office for one-on-one, closed-door meetings.  Delval's coworkers noticed the frequency of these meetings and would often joke to Delval about spending more time in the Chief's office in a few weeks than they had spent in their entire careers.  During one of these meetings, Chief DiSanti asked if Delval was interested in participating in the Attorney General's Drug Task Force.  Delval expressed her interest and stated that she had prior experience in working undercover operations at her previous job.  According to the letter and Delval's subsequent deposition testimony, Chief DiSanti responded by saying, "You, working prostitution? That's entrapment!"  Chief DiSanti then attempted to clarify his statement by explaining, "I'm complimenting you by the way. That's a compliment. You're very attractive."  Delval also alleged that Chief DiSanti criticized her for failing to volunteer for special duty assignments that would have placed her in

the community as the "face of the department," something he did not address with her male counterparts.

Third, the letter claimed Chief DiSanti initiated an unwanted and meritless investigation into Lt. Thomas Niebel ("Niebel") to determine whether Niebel sexually harassed Delval. Delval had never made any complaints against Niebel and she maintained throughout the investigation that Neibel had never behaved inappropriately towards her. The letter alleged that Chief DiSanti "used [Delval's] gender as a means to create a falsified sexual harassment claim against Lt. Niebel for [Chief DiSanti's] own personal gain."

Additionally, the letter disclosed a situation which occurred on Labor Day in 2017, being September 4, 2017, when Martin and Delval were leaving a holiday gathering at Chief DiSanti's home. Both Martin and Delval were on duty and in uniform. As Martin and Delval were leaving the home to return to their duties, Delval indicated that Chief DiSanti grabbed her, pulled her into his arms against her will, and attempted to kiss her on the lips. Delval states she turned her head at the last minute causing Chief DiSanti to kiss the right side of her head instead of her mouth. Later, when Delval told some of her fellow officers what had happened at Chief DiSanti's home, the officers revealed that he had frequently behaved this way towards their wives.

The letter went on to detail additional experiences and interactions Delval had with both Chief DiSanti and Lt. Basl. Delval's letter expressed that Chief DiSanti would often make sexual comments in the workplace that made her feel uncomfortable, including statements regarding his sexual relationship with his wife. These statements would often be made in the common areas of the police department in front of other police officers and support staff. According to Delval, Lt. Basl's sexually suggestive remarks were also "no secret to every member of this police

7

department[,]" and "[h]is constant sexual comments [were] daily and relentlessly [sic], and they have resulted in an uncomfortable work environment."  Among other things, Lt. Basl's frequent comments to other officers and support staff openly referenced things including nudity, male and female genitalia, and penetrative, oral and anal sex.

Many of Lt. Basl's alleged comments were directed towards fellow officer Ryan Hawk ("Hawk) but were broadcasted to the entire police department.  On September 25, 2018, when Delval was assigned to on-duty training at the Allegheny County Training Academy Range, Delval was driving her patrol car through a parking lot when Lt. Basl "turned his body to face [her], grabbed his genitals over his pants, stuck out his tongue, and began shaking his genitals and head at [her][,]" in a gesture representing oral sex.  Lt. Basl subsequently told Delval that he assumed Hawk, rather than Delval, was driving the patrol car when he made these gestures. Regardless of whether Lt. Basl mistook Delval for another officer, she felt that it was "unsettling that an individual who is responsible for the discipline of other officers is unable to control his immaturity while in a supervisory role" and just another example of his inappropriate behavior.

On October 26, 2018, as a result of receiving Delval's letter, Chief DiSanti was placed on leave pending an investigation into Delval's allegations.

**The Irwin Report**

In response to Delval's letter, McCandless hired Katherine Koop Irwin, Esquire ("Irwin") to conduct an investigation.  Irwin issued her final report on November 30, 2018, and a supplemental investigative report on January 7, 2019 (collectively "the Irwin Report" or "the investigation").  As part of her investigation, Irwin interviewed and obtained executed written statements from numerous witnesses, including Chief DiSanti and Lt. Basl.

After a thorough investigation, the Irwin Report concluded that a "voluminous amount of evidence" supported Delval's allegation that Lt. Basl frequently made graphic comments of a sexual nature in the workplace:

Seventeen (17) of the twenty (20) witnesses interviewed described Basl making either sexually-tinged or overtly sexual comments on a regular basis in all areas of the police department.  At least two witnesses, and sometimes more, heard Basl make the following comments:

a)  "Ryan Hawk, suck a cock" or "Ryan Hawk sucks cock;"
b)  "Shaving Ryan's Privates;"
c)  "Throat Yogurt," (referring to drinking semen) which Basl would say if someone was drinking something;
d)  "Hey June [or Jude] I want to see you nude;"
e)  "Eating hot dogs with no hands" (referring to giving oral sex, possibly to the Chief);
f)  "Suck it, Johnny;"
g)  "Smells like cum" or "Smells like semen" (in response to someone belching);
h)  "Are your meat curtains hurting?" or "Are your meat flaps hurting?" (referring to a woman's vagina);
i)  "It's like rolling a hot dog down a hallway;" (referring to a man with a small penis having sex with a woman, such that the woman could not feel if the man was penetrating her vagina);
j)  "Do you like riding the bike without the seat on?" or "Don't forget to put the seat on the bike" (said to Bike Patrol Officer Guzzo, and referring to anal penetration with a foreign object);
k)  "Hello Mother, Hello Father, I have a boner for your daughter" (sung to the melody of the Oscar Meyer Weiner song); and
l)  "Fag" and "Homo."

Almost every witnesses [sic] indicated that Lt. Basl made the above comments daily, if not weekly, as well as in the recent past.  Basl admitted to making all of the comments set forth in the [c]omplaint as well as some of the additional statements described above.  Basl stated that his conduct/comments were not unwelcome by the person to whom he was making them and were not made as frequently as described by the other witnesses.

In addition to the witness statements, various documentary evidence supports the conclusion that Basl made sexual-based comments in the workplace.  Specifically, various emails show Basl using the term Ramrod toward both Hawk and Administrative Assistant Marotta.  According to the urban dictionary, the term "Ramrod" refers to various graphic or

derogatory words for a penis. Finally, Basl calls Kolek a "fag" and a "loser" in a voicemail.

Aside from comments, only Hawk stated that Basl physically touched him in a sexual way. Hawk stated that on several occasions Basl would grab his head and push it toward his groin area. Basl admitted to doing this to Hawk at least once. Basl also claimed that Hawk would similarly grab his head and stated that they were engaged in horseplay. Hawk denied that he ever welcomed this type of interaction with/from Basl or that he thought this was a joke.

See Irwin Report, Doc. No. 96, Pl. Appx. at 75. Evidence showed that while some of Delval's colleagues occasionally made sexual-based comments, Lt. Basl was alone in making graphic and persistent sex-based remarks on a daily basis. Additionally, fourteen (14) of the interviewed witnesses stated that they were either offended by Lt. Basl's behavior, that his behavior interfered with their ability to do their jobs, or that they had separated themselves from him because of this behavior.

Following the investigation, Lt. Basl was suspended for ten (10) days and required to undergo approximately five (5) to seven (7) hours of sensitivity training. Lt. Basl completed all requirements and was permitted to return to work without any additional supervision at the end of his suspension term.

The investigation substantiated many of Delval's claims. Irwin's investigation found that the evidence supported the claim that Chief DiSanti called her into his office more during her training period than her male colleagues. Next, the investigation concluded that it was "more likely than not" that Chief DiSanti hugged and kissed Delval during the family gathering at his home. Additionally, further investigation revealed other similar instances in which Chief DiSanti hugged and kissed another officer's wife when this physical contact was unwelcomed and unsolicited.

Based on evidence obtained during the initial Irwin investigation, Chief DiSanti was subsequently investigated for making threatening statements about the individual who had reported his alleged misconduct.  When Chief DiSanti was informed of his suspension on October 28, 2018, he reportedly told McCandless town council president and the assistant town manager, "God help the person who did this." and "[w]hen I find out who did this to me, I'm going to…"  These comments were very similar to Chief DiSanti's reaction when he first found out about the anonymous letter.

Following the investigation, McCandless took corrective action against Chief DiSanti and Lt. Basl.  Both Chief DiSanti and Lt. Basl completed all requirements and were allowed to return to work.

On March 1, 2019, Delval's counsel forwarded a Notice of Claim on behalf of Delval and Flynn to McCandless.  The notice stated:

> This claim arises from injuries Officer Delval sustained as a result of ongoing and systemic sexual harassment and discrimination by the McCandless Police Department, the McCandless Town Council and the Town of McCandless, and all related treatment, injuries and damages which, as of this date, are ongoing. You have been aware of, an active participant in, and/or complicit in, this harassing and discriminatory conduct for a significant period of time.

See Doc. No. 96, Pl. Appx. at 112.  Thereafter, on March 22, 2019, Delval filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC") (the "PHRC/EEOC Complaint"). See Doc. No. 96, Pl. Appx. at 114.

On March 6, 2019, at the direction of Chief DiSanti, Detective/Sergeant Eric Egli of the McCandless Police Department sent an email to the entire police department instructing that anyone interested in applying for an open detective position should forward a letter of interest to

Chief DiSanti.  In response, Delval promptly sent a letter expressing her interest.  Thereafter, Chief DiSanti's secretary emailed the seven (7) officers who had expressed interest in the detective position, including Delval, advising them that interviews would take place on March 26, 2019.  She also requested supplemental documents such as resumes, certificates, etc.  Delval promptly responded and supplied the requested documents.

On the day of the scheduled interviews, Chief DiSanti told his secretary to tell the candidates that the interviews were postponed due to "manpower issues."  Despite the alleged "manpower issues" and without rescheduling the interviews, Chief DiSanti promoted Officer Michael Bock ("Bock") to detective in order to fill the open position.  Current McCandless Police Chief, Hawk, testified that Bock had been "tabbed" by Chief DiSanti to be a detective, and that when Hawk became the Chief of Police, he "oversaw the transition of Bock to detective." Delval was never interviewed for a detective position.

On February 24, 2020, Delval filed an amended complaint with the PHRC to incorporate multiple additional instances of "harassment and different treatment" that occurred after her PHRC/EEOC Complaint was filed in March of 2019, including events that occurred in September of 2019.  Delval received her right to sue letter on June 11, 2020.

Defendants move for summary judgment on several grounds, each of which will be addressed in turn.  Chief DiSanti and Lt. Basl contend summary judgment should be granted as to Counts I and II of the Civil Complaint because Delval failed to exhaust administrative remedies by failing to name Chief DiSanti and Lt. Basl as respondents in her PHRC/EEOC Complaint, requiring dismissal of this action.  Nevertheless, even if the court finds Delval did exhaust her administrative remedies, the PHRA and Title VII claims as to Chief DiSanti are barred by the applicable statutes of limitations.  Second, Chief DiSanti and Lt. Basl argue that

12

summary judgment should be granted as to Delval's state law claims at Counts III, V, and VII because the asserted claims are barred by the applicable statutes of limitations.  Next, Chief DiSanti and Lt. Basl contend that the facts do not support Delval's claim that she was retaliated against due to her PHRC/EEOC Complaint.  Lastly, as to Count IX, Chief DiSanti and Lt. Basl assert that in addition to Count IX being barred by the applicable statute of limitations, there is no proper common law claim that exists to which a loss of consortium claim can attach.

Defendant McCandless also moves for summary judgment on multiple bases.  First, McCandless contends that the <u>Faragher-Ellerth</u> doctrine precludes further proceedings on plaintiff Delval's hostile work environment claims because McCandless had an established workplace policy precluding discrimination, harassment and retaliation when Delval was hired, Delval did not invoke the protections in the policy for 440 days despite being aware of the policies, and once McCandless became aware of her complaints, it satisfied its obligations under both Federal and Pennsylvania law by investigating her claims and taking corrective action against defendants Chief Disanti and Lt. Basl.  Second, McCandless argues that Delval's claims at Counts IV, VI, and VIII fail because it is immune from liability pursuant to the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA") and there is no exception thereto that applies in this case.  Lastly, McCandless contends it is entitled to summary judgment at Count IX because Flynn's claim for loss of consortium is barred by the applicable statute of limitations and Delval has failed to state any "tangible personal injury" to support Flynn's claim.

Plaintiffs maintain the record contains adequate evidence to support findings needed to sustain her hostile work environment claims.  In this regard, Delval was assertedly subjected to a highly offensive work environment through persistent, relentless, and systematic sexual harassment and discriminatory treatment, and subsequent retaliation for reporting these

aforementioned abuses, specifically by Chief DiSanti and Lt. Basl.  It was only after Delval formally escalated the situation that any action was undertaken to conduct an investigation, despite McCandless being put on notice months beforehand.  And while McCandless did hire Irwin to conduct an investigation, which confirmed all of Delval's factual allegations, it failed to take any meaningful steps to control the environment or monitor Chief DiSanti or Lt. Basl's behavior and rather elected to continue to willfully ignore the complained of conduct.  Plaintiffs insist that these facts preclude defendant McCandless' ability to avail itself of the <u>Faragher-Ellerth</u> defense.  In other words, Delval argues there is sufficient evidence to support her disparate treatment, hostile work environment, and retaliation claims and defendants' contentions to the contrary are unavailing.

A. **Claims under the PHRA and Title VII[2]**

I. **Individual Liability under Title VII**

Count II of the Civil Complaint alleges gender disparate treatment, hostile work environment, and retaliation in violation of Tile VII against all defendants, including Chief DiSanti and Lt. Basl.  Based on long-standing precedent in the Third Circuit, Title VII does not impose liability on individuals.  <u>Sheridan v. E.I. DuPont de Nemours and Co.</u>, 100 F.3d 1061, 1079 (3d Cir. 1996) ("we are persuaded that Congress did not intend to hold individual employees liable under Title VII.");  <u>Dici v. Com. of Pa.</u>, 91 F.3d 542, 552 (3d Cir. 1996) ("[f]or the reasons previously given by the court in <u>Sheridan</u> and other courts of appeals, individual employees cannot be held liable under Title VII.");  <u>Walker v. Wolf</u>, 2022 WL 2703607, *2 (3d Cir. 2022) (finding that the district court "correctly dismissed [plaintiff's] Title VII . . .  claims to

---

[2] The same analysis applies to Title VII and PHRA claims.  <u>See</u> <u>Wilkerson v. New Media Tech. Charter Sch. Inc.</u>, 522 F.3d 315, 318-19 (3d Cir. 2008).

the extent he brought them against the Governor and Secretary of Transportation because only "employers" may be held liable under [Title VII].  [Title VII does] not provide for individual liability").  Chief DiSanti and Lt. Basl are individuals; therefore, they cannot be held liable under Title VII.  Accordingly, summary judgment will be granted in favor of Chief DiSanti and Lt. Basl with respect to any claim of individual liability under Title VII at Count II.

## II.    Supervisor Liability under PHRA

Defendants Chief DiSanti and Lt. Basl appear to argue that they cannot be held liable under the PHRA because are not "employers".  However, they fail to support this argument with any applicable case law or analysis in their briefs and only mention this issue in the "headings" of their memorandum in support of their motion for summary judgment.  Nonetheless, the court chooses to address this argument.

Unlike Title VII, the PHRA does provide for individual liability.  Dici v. Com. of Pa., 91 F.3d 542, 552-53 (3d Cir. 1996).  Liability under the PHRA extends to persons who "aid, abet, incite, compel or coerce the doing of any act declared ... to be an unlawful discriminatory practice." 43 Pa. Stat. § 955(e).  Court have limited individual liability under the PHRA to supervisory employees.  Dici, 91 F.3d at 552-53.  See Slater v. Susquehanna Cnty., 613 F.Supp.2d 653, 670 (M.D. Pa. 2009) (quoting Holocheck v. Luzerne Cnty. Head Start, Inc., 385 F.Supp.2d 491, 497 (M.D. Pa. 2005)) ("'[S]upervisors can share the discriminatory purpose and intent that is required for aiding and abetting.'").  However, the PHRA does not explicitly define which individuals qualify as a supervisor.  Therefore, we must look to Title VII for guidance.  Nelson v. Allan's Waste Water Serv., Inc., 2014 WL 109087, at *2 (W.D. Pa. 2014).

Pursuant to Title VII, an individual is a supervisor "if he or she is empowered by the employer to take tangible employment actions against the victim."  Vance v. Ball State Univ.,

570 U.S. 421, 424 (2013).  Tangible employment actions are those that involve "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Id. at 429, 431 (citations and quotations omitted).

Here, there is no dispute between the parties that Chief DiSanti and Lt. Basl are Delval's supervisors.  However, even if the parties did dispute this, the issue of whether an individual qualifies as a supervisor "must be answered by reference to the power that the individual actually holds, not by reference to his or her formal job title," and thus, is a question of fact to be answered by the jury.  See Zurchin v. Ambridge Area Sch. Dist., 300 F. Supp. 3d 681, 688-69 (W.D. Pa. 2018).  Further, it has been established that "'[w]hen a supervisory employee has knowledge of conduct which creates a hostile work environment, inaction by such an employee or failing to take prompt remedial action to prevent harassment rises to the level of individual aiding and abetting'" under the PHRA.  Hewitt v. BS Transportation of Illinois, LLC, 355 F. Supp. 3d 227, 238 (E.D. Pa. 2019) (citation and internal quotation marks omitted).  A supervisory employee may also be liable under § 955(e) "for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision."  Id.  (citation and internal quotation marks omitted); see, e.g., Dici, 91 F.3d at 553 (holding that an allegation that the plaintiff's supervisor knew or should have known that the plaintiff was being harassed by co-workers and repeatedly refused to take prompt action would, if proven true, constitute aiding and abetting).

In light of this, we cannot grant summary judgment in favor of Defendant Chief DiSanti and Lt. Basl on Delval's PHRA claims solely because they are not her "employers."  As Delval's supervisors and perpetrators of the complained-of conduct, Chief DiSanti and Lt. Basl are proper

defendants under § 955(e) and are potentially liable for aiding and abetting discriminatory practices.  As highlighted above, Delval has provided evidence, which if found credible by the jury, could impose liability for violations of the PHRA.  A reasonable jury could conclude that Defendants Chief DiSanti and Lt. Basl's conduct constituted aiding and abetting in violation of the PHRA because not only did they have knowledge of each other's unlawful conduct, they also failed to stop their own unlawful actions.  43 Pa. Stat. § 955(e).  Consequently, Defendants Chief DiSanti and Lt. Basl's motion for summary judgment of Count I on the basis that they are not "employers" under the PHRA will be denied pursuant to the "aiding and abetting" exception of the PHRA.

### III.    Delval's Retaliation Claims

Defendants Chief DiSanti and Lt. Basl assert that summary judgment should be granted as to Delval's retaliation claims because the facts prove that current McCandless police chief, Chief Hawk, and not Chief DiSanti, promoted Bock to the open detective position.  Further, Chief DiSanti asserts that Bock would have received the detective position because he was the best candidate for the position.  Therefore, because Chief DiSanti did not choose someone to fill the detective position, he could not have retaliated against Delval.  Delval responds that there is sufficient evidence in the record to allow a jury to conclude that Chief DiSanti cancelled Delval's interview for the detective position in retaliation for her making a PHRC/EEOC Complaint and that Chief DiSanti, and not Chief Hawk, actually chose Bock to fill the open detective position a few days after he cancelled her interview.  Further, Delval contends that this should be a question of fact for the jury.  We agree.

PHRA retaliation claims follow the same framework as retaliation claims pursued under Title VII.  Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005) (PHRA retaliation claims follow Title

VII's McDonell Douglas Framework).  Under this framework, a plaintiff must first make out a prima facie case of retaliation.  Id. at 184.  Once she does so, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for the challenged employment action.  Id.  If the defendant articulates a non-discriminatory motive, it then becomes the plaintiff's burden to prove, by a preponderance of the evidence, that the defendant's stated reason for the challenged action is a pretext for unlawful discrimination.  Id.  For purposes of surviving summary judgment, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perski, 32 F.3d 759, 764 (3d Cir. 1994).

In this case, defendants challenge Delval's ability to establish either a prima facie case or a genuine issue of fact relative to pretext.  To establish a prima facie case of retaliation, Delval must show that (1) she engaged in a protected activity; (2) she was subject to adverse employment action; and (3) that there is a causal connection between her protected activity and the adverse action taken against her.  Fasold, 409 F.3d at 188.  Defendants do not dispute that Delval engaged in a protected activity when she reported Chief DiSanti and Lt. Basl to Town Manager Toby Cordek ("Cordek") and the PHRC and EEOC, on October 21, 2018, and March 22, 2019, respectively.  Therefore, the first element of Delval's prima facie retaliation claim is established as a matter of law.

Nevertheless, defendants dispute the second and third elements of Delval's prima facie case.  For purposes of the second element, defendants dispute that Delval was subject to an adverse employment action when her interview for the open detective position was cancelled.  They argue Delval was not subject to an adverse employment action because Chief DiSanti cancelled not only

18

her interview, but all detective interviews due to "manpower issues." Additionally, as to the third element, Chief DiSanti contends that he was completely unaware of Delval's letter to Cordek or her PHRC/EEOC Complaint at the time he cancelled the detective interviews. Additionally, Chief DiSanti claims that Bock was not selected by him to fill the detective position, but rather selected by his successor, Chief Hawk, to become detective based on his qualifications. Therefore, Chief DiSanti argues that there is not a causal connection between Delval's protected activities and her interview for detective being cancelled.

Defendants' argument is unavailing. The court finds that there are genuinely disputed issues of fact for the jury to decide. The evidence establishes that (1) in early March of 2019, multiple officers, including Delval, applied for an open detective position at the request of Chief DiSanti; (2) on March 19, 2019, Delval received an email scheduling an interview for said position for March 26, 2019; (3) on March 22, 2019, Delval filed her PHRC/EEOC Complaint; and (4) on the day that interviews were scheduled to take place, they were cancelled by Chief DiSanti due to "manpower issues." However, Delval contends that on March 27, 2019, Chief DiSanti directed a lieutenant to inform Office Bock, a male officer who did not apply for the detective position, that he had been chosen for the position. Thus, we find that a reasonable factfinder could find Delval's version of events credible and that she was indeed removed from consideration for the open detective position which would qualify as an adverse employment action.

Additionally, Delval has provided evidence from which a jury could find a causal connection to her protected activity. To establish the requisite causal link between an employee's protected conduct and the employer's adverse employment action, courts consider whether there is "unusually suggestive timing" between the two events. See Ward v. Ingersoll-Rand Co., 688 F. App'x 104, 110 (3d Cir. 2017). "A close temporal proximity between a

protected activity and an adverse act may support an inference of [a] causal relationship where the timing is 'unusually suggestive.'" Id. (internal citation omitted). Here, the record provides that Chief DiSanti and Lt. Basl learned of Delval's report to Cordek in November of 2018 during their interviews with Irwin. Additionally, defendants received plaintiffs' Notice of Claim on March 7, 2019.[3] Lastly, Delval filed her PHRC/EEOC complaint a mere *four days* before her interview was cancelled by DiSantis. This timespan by itself supports a causal inference. See Jalil v. Avel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (inferring causation where the employer fired the plaintiff two days after the plaintiff filed a complaint).

Additionally, the record supports that both Chief DiSanti and Lt. Basl had some understanding that Delval was asserting claims of sexual harassment and discrimination against them before Delval's interview was to take place because they were notified of Delval's report to Cordek in November of 2018. The jury likewise could infer that defendants had no reason to believe Delval was no longer pursuing her claims and Chief DiSanti and Lt. Basl would have been made immediately aware of her PHRC/EEOC Complaint, given their supervisory positions; that being the chief of police and lieutenant of the police department. Viewing the evidence in the record in a light most favorable to Delval, these facts could arguably both support that (1) the "unusually suggestive timing" of Delval's detective interview being cancelled four days after she filed a PHRC/EEOC Complaint; and (2) that the decision to take Delval out of consideration for the detective position was motivated, at least in part, by her complaints to McCandless and the PHRC/EEOC. And as stated above, when Chief DiSanti was informed of his suspension on October 28, 2018, after he became aware that a complaint had been made against him to Cordek,

---

[3] Chief DiSanti and Lt. Basl deny, and plaintiffs argue, that they had actual knowledge of Delval's PHRC/EEOC Complaint on the day that the detective interviews were cancelled. Regardless, this would be a question of fact for the jury to determine.

he told McCandless town council president and assistant town manager, "God help the person who did this." and "[w]hen I find out who did this to me, I'm going to…."  The record shows that Chief DiSanti did indeed find out who reported him the very next month – Delval.  Because a jury could reasonably infer a causal connection between Delval's reports and her being removed from consideration for the detective position, the third element of the prima facie case has been satisfied.

The court must next consider whether Delval has produced sufficient evidence to establish a triable fact on pretext.  Here, there is no dispute that Chief DiSanti has articulated a nondiscriminatory reason for the adverse employment action – namely, "manpower issues," that Bock was more qualified for the position than Delval, and that Chief Hawk was the one who chose Bock for the detective position.

To withstand summary judgment, Delval "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.  Here, the court is satisfied that Delval has done so.  As discussed, a reasonable jury could reject both Chief DiSanti's assertion that he did not know about Delval's pending complaints at the time he cancelled the detective interviews and his contention that he didn't choose Bock for the detective position.  The record is clear that Irwin conducted an interview with Chief DiSanti and Lt. Basl in November of 2018.  A mere month after Chief DiSanti exclaimed, "God help the person who did this." and "[w]hen I find out who did this to me, I'm going to…"  Further, based on Chief Hawk's testimony that Bock had been "tabbed" by Chief DiSanti to be a detective before DiSanti retired, a jury could disbelieve DiSanti's proffered

reasons and instead conclude that the real reason why he cancelled Delval's interview was because she filed a complaint with McCandless and the PHRC/EEOC regarding her working conditions. Because the evidence is at least minimally sufficient to support a finding of pretext, Chief DiSanti and Lt. Basl's motion for summary judgment will be denied with respect to this claim.

### IV.   Exhaustion of Administrative Remedies

Defendants Chief DiSanti and Lt. Basl argue Delval failed to exhaust her administrative remedies under the PHRA[4] because (1) she did not specifically name Chief DiSanti and Lt. Basl as respondents in the complaint she filed with the PHRC/EEOC; and (2) and there was no assertion in her PHRC/EEOC Complaint that Chief DiSanti and Lt. Basl were being sued in their individual capacities. Therefore, they assert that summary judgment should be granted in their favor. Plaintiff responds that Chief DiSanti and Lt. Basl were in no way prejudiced by not being named in the caption of the administrative complaint because the contents of the PHRC/EEOC Complaint were more than sufficient to put them on notice. We agree and find defendants' arguments to the contrary to be meritless.

An employee must exhaust all administrative remedies by filing either a discrimination complaint with the PHRC or a Charge of Discrimination with the EEOC prior to filing a cause of action pursuant to the PHRA or Title VII. 42 U.S.C. § 2000e-5(f)(1); Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984). PHRA and Title VII claims are typically only permitted to be brought against those who are named as respondents in the underlying administrative actions. 42

---

[4] Additionally, Defendants Chief DiSanti and Lt. Basl argue that Delval failed to exhaust her administrative remedies under Title VII for the same reasons. However, as discussed at length above, there is no individual liability under Title VII. Therefore, the court will not directly address that specific argument.

U.S.C. § 2000e-5(f)(1); Schafer v. Bd. of Educ. of the Sch. Dist. of Pittsburgh, Pa., 903 F.2d 243, 252 (3d Cir. 1990).

Collectively, Defendant Chief DiSanti and Lt. Basl's names appear approximately twenty-three (23) times in the body of Delval's PHRA complaint that was cross-filed with the EEOC and twenty-one (21) times in the exhibit attached thereto.  "Naming [defendants] in the body of the charge satisfies the exhaustion of administration remedies requirement."  See Zurchin, 300 F. Supp. 3d at 688; Hitchens v. Greater Pittsburgh Cmty. Food Bank, 2006 WL 3051901, at *3 (W.D. Pa. Oct. 23, 2006); Zarazed v. Spar Mgmt. Servs., Inc., 2006 WL 224050, at *6 (E.D. Pa. Jan. 27, 2006).  As a result, Delval has satisfied the exhaustion of administration remedies requirement under the PHRA.  Consequently, Chief DiSanti and Lt. Basl's motion for summary judgment of Count I on the basis that Delval failed to exhaust her administrative remedies under the PHRA is denied.

### V.    Timeliness of Claims as to Defendant Chief DiSanti

To bring suit under Title VII and the PHRA, a plaintiff must timely exhaust each statute's administrative remedies.  See Woodson v. Scott Paper Co., 109 F.3d 913, 926-27 (3d Cir. 1997). Under Title VII, a claimant must file a charge with the EEOC reporting unlawful employment practices within one hundred eighty (180) days of the alleged conduct.  42 U.S.C. § 2000e-5(e)(1).  If the aggrieved employee initiates proceedings with a State or local agency with authority to grant or seek relief from the unlawful employment practice, then the charge must be filed within three hundred (300) days after the occurrence of the alleged unlawful employment action.  Id.  Under the PHRA, the claimant must file a complaint with the Pennsylvania Human Relations Commission within one hundred eighty (180) days of the alleged conduct.  43 Pa. Stat.

and Cons. Ann. § 959(h).  Because the federal period is longer, if a claim is untimely under Title VII, it will also be considered untimely under the PHRA.

In the instant matter, Chief DiSanti argues that any alleged unlawful actions taken by him against Delval that occurred prior to May 26, 2018, (i.e., 300 days from March 22, 2019), for her Title VII claims, and prior to September 23, 2018, (i.e., 180 days from March 22, 2019) for her PHRA claims, are time-barred.  Therefore, Chief DiSanti asserts that because the specific acts Delval alleges he committed all occurred in 2017 and she did not file her PHRC/EEOC Complaint until March 22, 2019, her claims are time-barred as they relate to him.

In response, Delval asserts that the harassment she endured from Chief DiSanti continued until Delval submitted her letter to Cordek on October 21, 2018.  Delval counters that a calculation from the date on which Delval had "had enough" and submitted a letter to Cordek, being October 21, 2018, to March 22, 2019, reveals that Delval's PHRA/EEOC Complaint was filed within 152 days, being well within the timeframes calculated by the statutes.  Further, Delval argues that even if the timeframe is calculated using the date specified in her PHRC/EEOC Complaint of when the initial harassment and discriminatory conduct continued through, being September 25, 2018, this still falls within the 180-day timeframe allotted under the PHRA and then obviously the 300-day time frame under Title VII.

Because the Court has already opined that there is no individual liability under Title VII, we will not address Chief DiSanti's argument that Delval's allegations of events that occurred in 2017 are also untimely under Title VII.  See discussion supra, Section A(I).  However, "[t]he proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably."  Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 n. 4 (3d Cir. 2009) (quoting Weston

v. Pennsylvania, 251 F.3d 420, 426 n. 3 (3d Cir. 2001) (citations omitted)).  Therefore, the case law below may reference both interchangeably.

Chief DiSanti's argument that Delval's claims as they pertain to him are time-barred because his alleged conduct occurred in 2017 defies logic.  The contention that she had to file on a single act of hostility is both contrary to the law and nonsensical.  A hostile work environment claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice and cannot be said to occur on any particular day."  National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115-17 (2002).  Chief DiSanti, as a matter of law, cannot separate out the individual acts he is alleged to have committed from the whole in order to prevent Delval from pursuing or establishing her hostile work environment claim.  "The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability.  And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days 'after' the single unlawful practice occurred."  Id. at 118.

The Supreme Court has made clear that because a hostile work environment is a continuing violation, "[i]n order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment."  Id. at 118.  To further demonstrate this point it has opined,

> (1) Acts on days 1–400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1–100 and on day 401, but there are no acts between days 101–400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that

> day that an actionable claim happened; on day 401 all incidents are still part of the same claim. On the other hand, if an act on day 401 had no relation to the acts between days 1–100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.

Id.  In other words, as long as any of the constituent acts were part of the same hostile environment, they remain within the scope of any timely filing of that single unlawful employment practice.  Given the nature of the unlawful employment practice at issue, Chief DiSanti's attempt to separate out his individual actions from the whole that created Delval's hostile work environment claim are futile.

Additionally, although Chief DiSanti has blankly stated that Delval's claims as to his individual acts are time-barred, he has failed to establish that she had a duty in 2017 to file a hostile work environment claim on the specific acts he was then involved with in order for them to be timely.  What is necessary for a hostile work environment claim is a showing that the offensive environment could reasonably be perceived and was perceived by the employee as hostile and capable of diminishing her job performance, continued employment, or professional growth, although such actual tangible effects need not be demonstrated.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993).   There is no magic formula for determining whether an environment is sufficiently hostile or abusive.  Id.   The decision must be made by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris, 510 U.S. at 23)).

Chief DiSanti has failed to show that Delval's work environment in 2017 was so sufficiently hostile or abusive that she could have successfully asserted a hostile work

environment claim at that time and neglected to do so.  And he has failed to provide any evidence that the events occurring in 2017 as they relate to him were actionable in themselves at that point in time, thereby starting the timeliness "clock" and forcing Delval to file suit at that time.  Rather, the record in this case supports the contrary.  In this regard, Delval indicates that the "final straw" was the September 25, 2018, incident that occurred with Lt. Basl at the Allegheny County Training Academy Range.  Accordingly, Chief DiSanti's motion for summary judgment of Count I on the basis that Delval's claims as to Chief DiSanti's individual actions are time-barred by the PHRA is denied.

### B.   **Faragher-Ellerth Affirmative Defense**

For purposes of its motion for summary judgment, McCandless does not argue that the record is insufficient to support the essential elements of Delval's claims in this case.  Rather, McCandless' motion seeks summary judgment on the grounds that the Faragher-Ellerth doctrine precludes further proceedings on plaintiff Delval's hostile work environment claims because McCandless had an established workplace policy precluding discrimination, harassment and retaliation when Delval was hired, Delval did not invoke the protections in the policy for 440 days despite being aware of the policies, and once McCandless became aware of her complaints, it satisfied its obligations under both Federal and Pennsylvania law by investigating her claims and taking corrective action against defendants Chief DiSanti and Lt. Basl.  See Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

Delval argues that the Faragher-Ellerth defense does not apply to the situation at hand because tangible employment action was taken against Delval by its failure to promote her, among other things, and therefore, McCandless is strictly liable.  Nevertheless, even if the court were to find that McCandless is not subject to strict liability, Deval contends that McCandless is

27

unable to present sufficient evidence to demonstrate that both requirements under the <u>Faragher-Ellerth</u> have been satisfied.

McCandless' efforts to foreclose Delval's claims as a matter of law pursuant to the <u>Faragher-Ellerth</u> doctrine fall short of the mark.  "Employers may be liable for either a supervisor's or a co-worker's discriminatory acts."  <u>In re Tribune Media Co.</u>, 902 F.3d 384, 399 (3d Cir. 2018).  When a hostile work environment is created by a non-supervising employee, such as a co-worker, then the employer is vicariously liable only if the employer was negligent in controlling working conditions.  <u>Vance</u>, 570 U.S. at 424; <u>Huston</u>, 568 F.3d at 104.  In general, "employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." <u>Huston</u>, 568 F.3d at 105.  In this scenario, the employee has the burden of proving the negligence needed to establish vicarious liability.  <u>Ellerth</u>, 524 U.S. at 767.

Where, however, a supervisor creates a hostile work environment, then a different set of rules apply.  <u>Vance</u>, 570 U.S. at 424.  In this scenario, when analyzing the facts in light of the <u>Faragher-Ellerth</u> affirmative defense, the first step is to determine whether the employee experienced a tangible employment action.  <u>Ellerth</u>, 524 U.S. at 765.  As discussed above, a tangible employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." <u>Id.</u>  <u>See also</u> <u>In re Tribune Media Co.</u>, 902 F.3d at 399.  <u>See</u> <u>Ellerth</u>, 524 U.S. at 765, <u>Faragher</u>, 524 U.S. at 807-08 ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action. . .").  In order to demonstrate that a supervisor's harassment culminated in a tangible employment action, "a

28

plaintiff must show that the tangible employment action was related to, or caused by, the alleged

unlawful harassment or retaliation." Seybert v. Int'l Group, Inc., 2009 WL 1971439, at *3

(E.D.Pa. July 6, 2009).

When it has been determined that a tangible employment action has been taken, strict

liability attaches, and the employer is unable to avail itself of the Faragher-Ellerth affirmative

defense. Ellerth, 524 U.S. at 765.  Pursuant to Title VII, as a result of a tangible employment

action being taken by a supervisor, the act of the supervisor thereby becomes the act of the

employer through the theory of vicarious liability.  Id. at 762.  See also Thomas v. Bronco

Oilfield Servs., 2020 WL 7021474, at *15 (W.D. Pa. Nov. 30, 2020) (citing Andreoli v. Gates,

482 F.3d 641, 648 (3d Cir. 2007)).

Here, Delval asserts that the Faragher-Ellerth affirmative defense is unavailable to

McCandless because Chief DiSanti is her supervisor and his pervasive and ongoing harassment

resulted in tangible employment action being taken.  These tangible employment actions include,

but are not limited to, her interview for the open detective position being abruptly cancelled just

four days after she filed her PHRC/EEOC Complaint and the position being given to a male

officer who did not even apply for it; Chief DiSanti and McCandless refusing to allow Delval to

use sick days donated by her colleagues that would have permitted her to receive her full salary

while on leave and instead being required to return to work to serve a light duty position at a

desk, thereby forcing Delval to go out on short-term disability and take leave under the Family's

First Coronavirus Response Act ("FFCRA") and the Family and Medical Leave Act ("FMLA").

Delval testified that being forced to take her leave in this manner caused her to receive only

approximately two-thirds (2/3) of her regular pay, being a significant decrease in her salary and

benefits.  McCandless does not specifically address these purported tangible employment actions raised by Delval.

In this case, McCandless' motion for summary judgment as it relates to its asserted Faragher-Ellerth defense must fail if the record is sufficient to support a finding that Delval experienced a tangible employment action.  If McCandless' motion clears this, it must still demonstrate the absence of any genuinely disputed issues of material fact with respect to both elements of the Faragher-Ellerth defense.  Therefore, the court will first address whether a jury could find that a tangible employment action was taken against Delval.

Here, there is no dispute between the parties that (1) Chief DiSanti was Delval's supervisor at the time she filed this case; (2) in early March of 2019, Delval applied for an open detective position; (3) on March 19, 2019, Delval received an email scheduling an interview for said position for March 26, 2019; (4) on March 22, 2019, Delval filed a complaint with the PHRC and the EEOC; and (5) on the day that interviews were scheduled to take place, all interviews were cancelled by Chief DiSanti.  Delval contends that on March 27, 2019, Bock, a male officer who did not apply for the detective position, was informed that he had been chosen for the position.

Chief DiSanti disputes Delval's version of events.  Chief DiSanti stands by the notion that he postponed interviews because of "manpower issues."  Additionally, Chief DiSanti asserts that he was not the one who promoted Bock to the detective position.  Rather, it was his successor, Chief Ryan Hawk, who later ultimately made the decision to promote Bock to detective because he was the most qualified for the position.  However, Chief Hawk testified that Bock had been "tabbed" by Chief DiSanti to be a detective and when Chief Hawk became Chief of Police, he simply "oversaw the transition of Officer Bock to detective."  The jury will

certainly be free to find this glaring inconsistency as a basis to cast sufficient doubt on Chief

DiSanti's assertion that he did not make the decision to promote Bock to detective.  See, e.g.,

Fuentes, 32 F.3d at 764 n. 7 ("the factfinder's rejection of some of the defendant's proffered

reasons may impede the employer's credibility seriously enough so that a factfinder may

rationally disbelieve the remaining proffered reasons, even if no evidence undermining those

remaining rationales in particular is available").

Viewing the forecast of evidence in the light most favorable to plaintiff, a reasonable jury

could very well conclude that Delval suffered a tangible employment action when Chief DiSanti

eliminated her from consideration for the detective position by cancelling her interview and

giving the position to a male officer who did not even apply for it.  It does not matter here

whether Delval would have received the position of detective had the interview occurred.  It only

matters that Delval was unable to be considered for the position of detective because Chief

DiSanti cancelled the opportunity for her to be considered for it.  Given this state of affairs,

Delval has created a triable issue of fact as to whether she suffered a tangible employment

action.

Delval has also created a triable issue of fact as to whether she suffered a tangible

employment action when Delval was prohibited by McCandless from using her sick days in

order to receive full pay while on maternity leave.  Delval testified that several of her co-workers

donated sick days for her to use after having her first child.  Delval states that McCandless

denied her request to use those donated sick days while her son was in the NICU, and she was

recovering from a traumatic birth.  Instead, Delval was forced to use short-term disability and

take leave under FFCRA and FMLA after her disability period ended, resulting in her only

receiving approximately two-thirds (2/3) of her regular pay.[5]  Given that the jury could find that this treatment occurred and resulted in a decrease in pay, a reasonable jury could conclude that McCandless is precluded from prevailing on the Faragher-Ellerth defense because it took tangible employment action against her.

Plaintiff also presents evidence from which a jury could reasonably conclude that Chief DiSanti's failure to promote her was due to discriminatory reasons based on her gender. According to Delval, from the beginning of her tenure as a McCandless police officer Chief DiSanti treated her differently from her male counterparts.  Delval contends that (1) Chief DiSanti assigned Officer Martin as her training officer because she was female and Officer Martin was in a committed relationship; (2) her field training was substantially and materially different than her male counterparts because of her gender – an example being when she was denied a DUI arrest because of her gender; (3) she was subjected to several "closed door" meetings with Chief DiSanti who often questioned her field training experience and other aspects of her employment when other male officers were not subjected to this type of questioning; (4) Chief DiSanti initiated an unwanted and unfounded investigation into claims that another officer, former Lt. Neibel, sexually harassed her; (5) Chief DiSanti criticized her work performance when she did not volunteer for special duty assignments when other male officers were not criticized for not volunteering for these assignments; (6) Chief DiSanti hugged and kissed her on one occasion at his home when she was in uniform and on duty; (7) she was utilized by Chief DiSanti as a prop for community events where no actual policing activities were conducted or necessary to be the "young, pretty face of the department;" (8) in response to her interest in working with the Attorney General's Drug Task Force, DiSanti commented that her prior

---

[5] It is undisputed that Delval did not receive her full pay during her leave.

experience working undercover as a prostitute for the City of Pittsburgh's Narcotics and Vice Unit was "entrapment" because she was "very attractive;" and (9) Chief DiSanti began targeting her because he felt rejected after she did not volunteer for his "social media spectacles."

Viewing these facts in the light most favorable to Delval, a jury could find her version of events credible and conclude that Chief DiSanti's failure to promote Delval to the position of detective was due to her gender.  The jury could find that Chief DiSanti believed that a female police officer's role was to be the "young, pretty face of [a police] department" and that Delval was exceeding this role by wanting to engage in actual police work such as making arrests, working undercover, and trying to become a detective, instead of being a visually appealing liaison for the department at community functions.  And a reasonable jury could find that in order to cover up the fact that he was treating Delval differently as a female officer, he cancelled all interviews for the detective position and unilaterally promoted a male to fill the role instead. Consequently, material issues of fact remain about whether the course of alleged harassment culminated in a tangible employment action.

Even assuming, *arguendo*, that a tangible employment action was not taken against Delval, material factual disputes still remain so as to preclude summary judgment. If no tangible employment action is taken against an employee by a supervisor, an "employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Vance, 570 U.S. at 424 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765).  Vicarious liability may be imposed in such circumstances because, although less direct, the harasser is still "aided-in-the-accomplishment" of the harassment by the very nature of his or her position of

authority over the employee.  Id. at 429-30.  In this regard, "a supervisor's power and authority invests his or her harassing conduct with a particularly threatening character, and in the sense, the supervisor is always aided by the agency relation."  Id. at 430.  Permitting the defendant to raise and prove the affirmative defense in this setting both accommodates the agency principles of vicarious liability and advances "Title VII's equally basic polices of encouraging forethought by employers and saving action by objecting employees."  Id. (citing Faragher, 524 U.S. at 803-5; Ellerth, 524 U.S. at 763).

The "cornerstone" of an analysis assessing an employer's invocation of the Faragher-Ellerth defense is "reasonableness."  Minarsky v. Susquehanna County, 895 F.3d 303, 311 (3d Cir. 2018).  The first prong is focused on "the reasonableness of the employer's preventative and corrective measures," while the second is focused on "the reasonableness of the employee's efforts (or lack thereof) to report misconduct and avoid harm."  Id.

There is no question that the first prong of the defense places on a defendant the duty to "exercise reasonable care to prevent and correct promptly" any unlawful harassing behavior in the workplace.  Id. at 312.   And from the beginning, the Court made clear that "the existence of a functioning anti-harassment policy *could* prove the employer's exercise of reasonable care so as to satisfy the first element of the affirmative defense."  Id.  (emphasis in original) (citing Faragher, 524 U.S. at 807).  But maintaining a written anti-harassment policy and requiring a new employee to acknowledge having received and read the policy at the commencement of employment does not mean that the inquiry on the first element is definitively satisfied in a defendant's favor.  Id.; Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 118 (3d Cir. 1999) ("Ellerth and Faragher do not, as the defendants seem to assume, focus mechanically on the formal existence of a sexual harassment policy, allowing an absolute defense to a hostile work

environment claim whenever the employer can point to an anti-harassment policy of some sort."); Kanish v. Crawford Area Transportation Auth., 2021 WL 1520516, *6 (W.D. Pa. March 26, 2021) ("The mere existence of an anti-discrimination policy, however, does not establish that a defendant has met its burden for the first element of the defense.") (collecting cases).  And this is so even though the policy provides multiple avenues to report harassing behavior.  Minarsky, 895 F.3d at 312.

Instead, careful consideration of the entire constellation of circumstances must be undertaken in assessing whether there are material facts in dispute that can support a finding that the defendant put a policy in place that sufficiently was calculated to be effective and discharge its duty "to exercise reasonable care to prevent and correct promptly any [] harassing behavior." Id. at 313.  For example, evidence from which the finder of fact could infer that harassment existed in the workplace and/or was continuing despite the existence of the adopted policy can have a meaningful bearing on whether the reasonable care standard has been met as a matter of law.  Id. at 312-13; see also Tillison v. Capitol Bus Co., 2008 WL 2704536, *9 (M.D. Pa. July 8, 2008) (the lack of affirmative steps or training beyond the promulgation of an antiharassment policy coupled with the plaintiff's brief review of the policy at the time of hire created a material issue on whether the defendant acted reasonably as to the first element of the affirmative defense); Bennett v. Progressive Corp., 225 F. Supp.2d 190, 206-7 (N.D. N.Y. 2002) (the measures an employer has taken to disseminate a policy, its response to any inappropriate behavior in the workplace, and the effectiveness of any such response are to be considered; issues of fact as to whether the employer's policy and actions are effectively remedial and promptly aimed at preventing and eliminating harassing behavior are within the province of the jury) (collecting cases).

Here, several aspects of the record preclude McCandless' efforts to insulate from further consideration its undertakings seeking to establish the exercise of due care as a matter of law. First, Lt. Basl admits that he engaged in most of the behaviors and did make most of the sexual comments highlighted by Delval. Second, Lt. Basl openly acknowledges that he was aware of the contents of McCandless' anti-harassment policy at the time he engaged in the complained-of behavior/language and nonetheless continued to act in this manner.

Third, Lt. Basl confesses that he engaged in this harassing behavior in the hallways, roll call room, and other areas of the police station in front of other police officers and support staff, making clear that no area of the police station was "safe" from his antics. Lt. Basl even went so far as to engage in this behavior when he was alongside other police officers on patrol. Numerous officers who spoke with Irwin stated that Lt. Basl engaged in this conduct on a daily basis and fourteen officers stated that they were offended by his conduct, it interfered with their ability to do their jobs, or they separated themselves from him because of his conduct.

Fourth, Lt. Basl acknowledges that he conducted himself in such a way even though he knew he was viewed as part of the management level in the police department. The only other individual tasked with monitoring the integrity of the work environment was Chief DiSanti, who also is accused by Delval of playing a large role in creating the hostile work environment. And although a majority of the McCandless police officers acknowledged that they had witnessed Lt. Basl's behavior every day within the workplace over the course of several years, and Lt. Basl himself admitted to committing a majority of the acts and making most of the sexual comments he is accused of saying, Chief DiSanti testified that he was unaware that Lt. Basl ever behaved in a manner consistent with these claims.

Fifth, in May of 2018, the president of the Town of McCandless Town Council received an anonymous letter advising McCandless of numerous issues plaguing its police department. While the president and another former council member met with Chief DiSanti to discuss the contents of the letter, he immediately steered the focus of the meeting to figuring out who wrote the anonymous letter so that he could take action against that individual. No further action was undertaken in response to the letter.

And although the letter did not specifically contain any accusations as to Chief DiSanti or Lt. Basl's harassing behavior against Delval, the inference is raised that McCandless and Chief DiSanti were made aware of the fact that there were issues plaguing the police department and its management team. Despite this, both McCandless and Chief DiSanti did not engage in any real work to address the explore and/or address the issues raised in the letter. Rather, instead of Chief DiSanti attempting to change the morale of his police station or McCandless attempting to intervene in some way to ensure that the matter was investigated, nothing was done.

The inference is also raised that McCandless independently could be found to have failed to exercise reasonable care to prevent harassing behavior. Although it had a published anti-harassment policy, the record is devoid of anti-harassment policy training or even reminders to its employees of its policy.

This constellation of circumstances is enough to permit the finder of fact to pass on whether McCandless met its burden of exercising reasonable care to prevent and correct promptly any harassing behavior. The inference is raised that the anti-harassment policy was insufficient to impress upon Lt. Basl the need to keep such behaviors and language out of the workplace. It equally can be inferred that it was insufficient to impress upon the Chief of Police the need to do the same and/or for both Chief DiSanti or Lt. Basl to recognize the harm created

from such a toxic environment.  It can also be inferred that because McCandless had an anti-harassment policy in place and it made an effort to ensure it was distributed to all new hires, it recognized at least the need for such a policy.  And despite recognizing the need for an anti-harassment policy in the workplace, McCandless failed to assure that its employees had any type, let alone a sufficient level, of anti-harassment training.

Given the entirety of the record as read in the light most favorable to Delval and the numerous inferences about the shortcomings of McCandless' efforts to prevent impermissible harassment in the workplace in the first place, the issues of whether McCandless exercised reasonable care to prevent and correct any unlawful behavior are issues that must be reserved for the finder of fact.

Material issues of fact likewise abound about whether defendant's response to plaintiff's complaints of harassment constituted the exercise of reasonable care to correct promptly the reported harassing behavior.

Defendant likewise has failed to demonstrate that the record can only support a finding that plaintiff unreasonably failed to take advantage of the actual preventive or corrective opportunities provided or to avoid harm otherwise.  This element, and the concomitant inquiry, are "tied to the objective of Title VII, to avoid harm, rather than provide redress." Minarsky, 895 F.3d at 313.  And as a general matter, a significant passage of time while the harassment is ongoing coupled with the employee's failure to take advantage of a well-implemented and effectively functioning anti-harassment policy will foreclose the employee's ability to defeat the employer's invocation of the Faragher-Ellerth defense.  Id. (citing Jones v. Southeastern Pa. Transp. Auth., 796 F.3d 323, 329 (3d Cir. 2015) (employee's failure to report ongoing hostile work environment for over ten years and decision to do so only after she was written up for time-

sheet fraud coupled with the undisputed fact that the employee had worked in the employer's office of civil rights, thus giving her knowledge of the existing anti-harassment policies and procedures, established the employee's failure to exercise reasonable care or otherwise avoid harm as a matter of law)).  Nevertheless, workplace harassment is "highly circumstance-specific" and careful consideration must be given to the facts surrounding the employee's actions responsive to the harassment in order to assure that where appropriate, material issues about the reasonableness of those responses are left for the jury's consideration.  Id. at 314.

There are several principles that guide the inquiry.  First, while an employee's outright failure to report persistent harassment can be significant where effective opportunities are available to do so, the mere failure of an employee to report his or her harassment "is not *per se* unreasonable."  Id.  Second, "the passage of time is just one factor in the analysis."  Id.

Moreover, the particular nature of the working relationship between the alleged victim and perpetrator must be examined.  In this setting, evidence that a supervisor utilized his or her control over the work environment or took advantage of his or her vested authority to facilitate the harassment can provide meaningful insight into whether an employee's responsive reactions can be found to have been reasonable.  Id.  The supervisor's response to an employee's efforts to curb the offensive behaviors as well as any outside financial pressures that heighten any risk likely to be generated from an employee mounting further resistance and taking formal action also are not to be overlooked.  Id. at 315.

If an employee asserts fear of retaliation as a basis for inaction in invoking the formal leavers of an anti-harassment policy, the surrounding circumstances must be examined to ferret out those situations where the fear could be determined to be well-founded and thus a reasonable response to a perplexing or complicated situation.  Id.  Of course, a generalized fear of retaliation

"is insufficient to explain a long delay in reporting" harassment.  Id. (collecting cases).  But in contrast, fear of adverse action that is substantiated by record evidence can support a finding that the employee acted reasonably in not reporting the offending conduct.  Specific record evidence bearing on any proclaimed fear of retaliation, whether from prior interactions between the employee and the supervisor or between other employees and the supervisor and/or upper management may be used to explain why an employee's inaction could be found to be reasonable under the circumstances.  For example, if the supervisor instilled in the employee a belief of mistrust of those who would consider and act on any report of misconduct, or if the supervisor had a track record of avoiding meaningful discipline for engaging in impermissible conduct, such evidence may well shed light on why a belief that availing oneself of the machinery behind an anti-harassment policy "would be futile, if not detrimental"  and thus capable of being found objectively reasonable under the circumstances.  Id. at 316.

Here, there is substantial record evidence which when construed in Delval's favor could support a finding that Delval's delay in invoking McCandless' anti-harassment policy was not an unreasonable failure to take advantage of a preventive opportunity or to avoid harm otherwise.  First, McCandless' argument that Delval failed to timely avail herself of its anti-harassment policy because she received a copy of it upon her hiring and admitted to signing an acknowledge of receiving and reading the policy, this acknowledgement was obtained at the beginning of Delval's employment.  While McCandless will be able to argue that the availability of the information on its anti-harassment policy was enough to make Delval fully aware of how it was intended to be implemented and the protections it was intended to provide, the jury may find that at the time of hire, Delval's concerns about being harassed were non-existent and her mere acknowledgement of receiving the anti-harassment policy does not equate to a meaningful

understanding of the policy's scope, operations and protections.  Compare Smokin' Joe's Tobacco

Shop, 2007 WL 1258132, *7 ("While Smokin' Joe's had an anti-discrimination policy that was

disseminated to employees in the employee handbook, this alone is not a basis for granting

summary judgment to the defendant."); Tillison, 2008 WL 2704536, *9 (brief review of anti-

harassment policy with employee on the first day of employment coupled with evidence

suggesting little else was done in implementing the policy created a genuine issue of material

fact on whether the defendant acted reasonably to prevent harassment).

>    McCandless' anti-harassment policy provides

>    [a] employee who believes he or she has been sexually harassed shall contact
>    his/her immediate supervisor.  If the employee is making an allegation against
>    the immediate supervisor, he/she should contact the next higher level in the
>    McCandless Police Department's chain of command.  The employee shall submit
>    a report through the chain of command to the Chief of Police, detailing the
>    circumstances of the alleged sexual harassment.  In the event that the allegation
>    is against the Chief of Police, the report should be made directly to the
>    Town Manager.

See Doc. No. 91-1 at 5.  Here, because Lt. Basl was one of the perpetrators of harassment, the

next higher level in the command chain of the police department would be Chief DiSanti – the

other perpetrator.  Therefore, Delval appropriately availed herself of the anti-harassment policy

by making a direct report to McCandless Town Manager Toby Cordek.  However, there is not an

accusation by McCandless that Delval didn't avail herself of its anti-harassment policy. But

rather that she didn't do it in a timely fashion – waiting 440 days from the first occurrence of

alleged harassment – and failed to provide a "reasonable explanation" as to why she waited so

long to report the harassment.

>    Chief DiSanti's control of the police station and Lt. Basl undisputedly being superior in

rank to Delval and the power dynamic between Delval and Chief DiSanti and Delval and Lt.

Basl also can be found to have a bearing on Delval's delay in reporting their conduct.  Chief

DiSanti, as McCandless' Chief of Police, was in charge of the McCandless police department and its staff.  Within the police department, Chief DiSanti did not answer to any other officer, and he had direct control over Delval's working environment and working conditions.  He directly reviewed Delval's work assignments and roles within the police department, as evidenced on one occasion when he considered Delval for the Attorney General's Drug Task Force.  During this meeting, Chief DiSanti commented that Delval's prior experience working undercover as a prostitute for the City of Pittsburgh's Narcotics and Vice Unit was "entrapment" because she was "very attractive."

Lt. Basl also had dominance over Delval.  As stated above, Lt. Basl was a higher rank than Delval as a lieutenant.  Additionally, he was also exclusively involved in the assigning of overtime to officers within the department.

The dominance Chief DiSanti and Lt. Basl had over the day-to-day functioning of the police station could very well be viewed by the jury as a factor in evaluating the reasonableness of when and how Delval chose to respond to the barrage of harassment she experienced.  Although Delval knew that Chief DiSanti was her supervisor solely as his position as police chief, Chief DiSanti's actions also led Delval to believe that he was capable of directly affecting the trajectory of her career.  Shortly after Delval joined the police force, Delval states she was made well-aware of Chief DiSanti's personal vendetta against former Lt. Niebel.  As a result of this personal vendetta, Chief DiSanti initiated a harassment investigation against Lt. Niebel on behalf of Delval although she was not sexually harassed, mistreated, or inappropriately contacted by Lt. Niebel.  Lt. Niebel was forced to retire from the police department after Chief DiSanti initiated the false sexual harassment investigation.

Additionally, as discussed in great detail above, before Delval sent her letter to the McCandless Town Manager reporting the harassment she was experiencing from Chief DiSanti and Lt. Basl, Delval had sent an anonymous letter five months prior addressing a number of issues stemming from Chief DiSanti's management (or mismanagement) of the department. Even though this prior letter did not allude to any harassment claims, when Chief DiSanti was approached by council members to discuss the contents of the letter he became fixated on ascertaining the author's identity. He threatened to launch a full investigation by studying the writing, stamp, and any other potentially identifying characteristics, even going so far as to claim he would have the letter fingerprinted in order to identify the complainant.

The jury will be able to consider the power dynamic between Lt. Basl and Delval, and Chief DiSanti and Delval, and the impressions Chief DiSanti's behavior/actions had on Delval. Assuming the jury credits Delval's account, the jury could find that Delval's delay in reporting the harassment was reasonable given Chief DiSanti's known reactions to those who challenged or disagreed about how he managed the police department and had the ability exert significant control over the trajectory of Delval's career.

In short, Delval ultimately availed herself of McCandless' anti-harassment policy. In assessing McCandless' argument that Delval waited an unreasonable amount of time to do so, the jury will be able to take into consideration Chief DiSanti's unilateral control of the police department, Lt. Basl being Delval's supervisor, the power dynamic between Delval, Chief DiSanti and Lt. Basl, and the impressions Chief DiSanti's behavior/actions had on Deval. It may conclude from this constellation of circumstances that any delay in invoking McCandless' anti-harassment policy was not an unreasonable failure to take advantage of a preventive opportunity or avenue to avoid harm. In other words, the jury may find that McCandless has failed to show

43

that the record only can be read as demonstrating that Delval failed to exercise reasonable care to avoid the incessant harassment perpetrated by Chief DiSanti and Lt. Basl or to protect herself from harm.  Consequently, the record presents material issues of fact on the second element of McCandless' affirmative defense and McCandless' motion for summary judgment of Count II on the basis that the Faragher-Ellerth affirmative defense will be denied.

      **C.**      **The Pennsylvania Political Subdivision Tort Claims Act**

      As to plaintiffs' state law claims, McCandless asserts that Delval's claims of intentional infliction of emotional distress, negligence, negligent hiring/retention, and loss of consortium as they relate to McCandless are barred by the Pennsylvania PSTCA.  Delval counters that the immunity provided by the PSTCA does not apply to a local agency when its employee acted in a willful manner; and because Chief DiSanti and Lt. Basl's conduct was intentional, McCandless is not protected under the Act.

      The parties do not dispute that McCandless is a local agency as defined under the PSTCA.  42 Pa. Cons. Stat. §§ 8541, *et seq*.  The PSTCA grants governmental immunity to political subdivisions and local agencies against claims for damages on account of an injury to a person or to property and only contains a waiver of this immunity as to eight narrow exceptions. 42 Pa. Cons. Stat. §§ 8542(b)(1)-(8).  These include (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody or control of animals.  Id. See Orange Stones Co. v. City of Reading, 87 A.3d 1014, 1022 (Pa. Cmwlth. 2014) ("In order to overcome the defense of governmental immunity, a plaintiff's claims against a local agency must sound in negligence and must fall within one of the eight enumerated exceptions to local agency

immunity. . . ."). Plaintiffs do not allege negligence within any of these enumerated exceptions, and therefore, cannot sustain a common law negligence claim against McCandless.

Additionally, under the PSTCA, local agencies are not liable for injuries caused by their own acts or the acts of their employees that constitute "crime[s], actual fraud, malice or willful misconduct." 42 Pa. Cons. Stat. § 8542(a). Intentional torts are considered "willful misconduct" under § 8542(a). Orange Stones Co., 87 A.3d at 1022-23 ("It is well-settled that where a plaintiff has averred willful misconduct on the part of local agency employees, section 8542(a)(2) of the Tort Claims Act, 42 Pa. C.S. § 8542(a)(2), bars recovery from the local agency because liability may be imposed on a local agency only for negligent acts.") (internal citations omitted). Accordingly, the PSTCA bars all of plaintiffs' remaining state law claims against McCandless. Therefore, summary judgment will be granted in favor of McCandless as to all state law claims asserted at Counts IV, VI, and VIII.

Moreover, because summary judgment will be granted in favor of McCandless as to all asserted state law claims pursuant to the PSTCA, the only remaining claims against McCandless are based on Title VII and the PHRA. "Under Pennsylvania law, loss of consortium claims derive from the injured spouse's right to recover in tort law." Little v. Jarvis, 280 A.2d 617, 620 (Pa. Super. Ct. 1971). "There is no right to recover for loss of consortium, however, based on civil rights claims under Title VII[] [or] the PHRA. . . ." Dean v. Philadelphia Gas Works, 2019 WL 6828607, at *5 (E.D. Pa. Dec. 12, 2019). Therefore, because the only remaining claims are based on Title VII and the PHRA, McCandless' motion for summary judgment will be granted with respect to Flynn's claim for loss of consortium at Count IX as it relates to McCandless.

### D.      Timeliness of the Plaintiffs' State Law Claims

Chief DiSanti and/or Lt. Basl assert that Delval's state law claims of assault, battery, intentional infliction of emotional distress, negligence, and loss of consortium are all barred by the applicable statutes of limitation.  They contend these claims are time-barred because Delval's PHRC/EEOC Complaint alleges that Chief DiSanti committed an assault and battery on September 4, 2017, and both defendants individually committed acts of negligence and intentional infliction of emotional distress during the time period listed on the administrative complaint – August 7, 2017, through September 25, 2018.  Therefore, defendants argue these claims are untimely because this lawsuit was filed on October 30, 2020, which is more than two years after these events were alleged to have occurred.

Plaintiffs response is two-fold.  First, they contend that because they received their PHRC right to sue letter on June 11, 2020, and their Civil Complaint was filed on October 30, 2020, their claims were filed within two years and are not-time barred.  From their perspective, Section 12(c) of the PHRA essentially "tolls" the statute of limitations for their state law claims.  They claim that the "clock" does not start until a complainant receives a right to sue letter from the PHRC.  Without any citation to relevant case law, plaintiffs maintain that the statute of limitations for their various state law claims should be tolled to exclude the time consumed by the PHRC and EEOC investigating their claims.

Plaintiff's attempt to invoke the administrative process to toll the filing date for their tort claims is unavailing.  A review of the PHRA and case law reveals that Section 12(c) of the PHRA will not save a plaintiff's state law claim(s) if the statute of limitations has expired.  A reading of Section 12(c) of the PHRA only (1) directs that the PHRC must notify the complainant if, within one year of filing his/her complaint, it dismisses the complaint or has not entered into a conciliation agreement so that the complainant is able to file his/her action in cour;

and (2) indicates that "persons with claims that are cognizable under the [PHRA] must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act."  See Vincent v. Fuller Co., 532 Pa. 547, 550 (Pa. 1992) (citing Clay v. Advanced Computer Applications, Inc., 559 A.2d 917 (Pa. 1989)). There is no mention in the statute that filing a complaint with the PHRC tolls the statute of limitations for any related claims that a complainant may file in state court after exhausting the administrative process prescribed by the PHRA.  Additionally, "federal district courts have consistently extended the logic of Johnson v. Railway Express Agency, 421 U.S. 454, 465-66 (1975) to hold that the pendency of a discrimination charge before the PHRC or EEOC *does not* toll the statute of limitations for related Pennsylvania state tort claims."  Burlingame v. Pretium Packaging, 2006 WL 2302375, at *5 (M.D. Pa. 2006) (emphasis added).  For these reasons, plaintiffs' attempt to save their state law tort claims by operation of Section 12(c) of the PHRA fails.

        Next, plaintiffs contend that their state law claims are not barred by the applicable statutes of limitation because the Civil Complaint "clearly establishes" that the tortious conduct took place from August 7, 2017, through September 28, 2018, and Delval's PHRC/EEOC Complaint was timely filed within 180 days of September 28, 2018.  However, plaintiffs' argument misses the mark.  "It is well-established that federal courts apply state law to determine when an action accrues for the purposes of the statute of limitations in matters arising under state law."  Creghan v. Procura Mgmt., Inc., 91 F. Supp. 3d 631, 648 (E.D. Pa. 2015).  Generally, a "statute of limitations period begins to run when a cause of action accrues; i.e., when an injury is inflicted and the corresponding right to institute a suit for damages arises."  Gleason v. Borough

of Moosic, 15 A.3d 479, 484 (Pa. 2011).  This standard for accrual comports with federal

practice generally.  See Wallace v. Kato, 549 U.S. 384, 387 (2007).

Moreover, it is the "duty of the party asserting a cause of action to use all reasonable

diligence to properly inform him or herself of the facts and circumstances upon which the right

to recovery is based and to institute suit within the prescribed period." Gleason, 15 A.3d at 484.

Typically, once the statute of limitations has run, the complainant is barred from bringing suit.

Id.  Therefore, when determining whether the statute of limitations period has expired, a court

must first determine when the "injury [was] inflicted" instead of when the complainant's

administrative complaint was filed in relation to the alleged injury.  See id.  Accordingly,

plaintiffs' attempt to convince the court that they complied with the applicable statutes of

limitation on their state law claims because Delval timely filed her administrative complaint is

misplaced.

Other than Delval's assault and battery claim against Chief DiSanti, ascertaining a

consistent accrual date in the record is challenging.  There are numerous places in the record

where Delval declares that the complained-of harassment and discrimination ended sometime in

the Fall of 2018, without listing a consistent month and/or date.  The Civil Complaint states

"Officer Melissa Delval was subject to constant, persistent and systematic harassment and

discrimination, specifically by Defendant DiSanti, Defendant Basl and other employees of

Defendant McCandless, from . . . August 7, 2017 through **September 25, 2018**." See Civil

Complaint, ¶ 18.  Plaintiffs' response in opposition to Chief DiSanti and Lt. Basl's motion for

summary judgment contends "[i]t is clear from the facts set forth above that Defendant DiSanti's

pervasive, constant and ongoing harassment continued up through the time Plaintiff Delval

submitted her letter to Town Manager Toby Cordek on **October 21, 2018**." See Doc. No. 100 at

22.  Perhaps most telling, plaintiffs' response in opposition when directly addressing Chief DiSanti and Lt. Basl's argument that the state law claims are barred by the applicable statutes of limitation states: "[p]laintiffs['] Complaint clearly establishes that Defendant DiSanti and Defendant Basl's pervasive, constant, and ongoing harassment and discriminatory conduct took place from August 7, 2017 through **September 28, 2018** . . . ."  See Doc. No. 100 at 26.

Here, Delval's assault and battery claims are premised on when Chief DiSanti grabbed and forcibly kissed Delval at a family gathering at his home on September 4, 2017.  Delval's Civil Complaint and PHRC/EEOC Complaint makes it clear that she was aware of the alleged harm on that day.  Because Delval's Civil Complaint was not filed until October 30, 2020, over three years after this event occurred, this claim is barred by the applicable statute of limitations.  Accordingly, summary judgment will be granted in favor of Chief DiSanti as to Count III.

With regard to Delval's remaining state law claims against Chief DiSanti and Lt. Basl for negligence, intentional infliction of emotional distress, and loss of consortium, we must determine whether the statutory period of limitations has passed.  Under Pennsylvania law, the statute of limitations for assault, battery, intentional infliction of emotional distress, and negligence is two years.  42 Pa.C.S.A. §§ 5524(1), (2), (7).  As stated above, plaintiffs filed their Civil Complaint on October 30, 2020.  Therefore, regardless of whether the court uses the dates of September 25, 2018, September 28, 2018, or October 21, 2018, plaintiffs' state law claims are barred by the applicable two-year statute of limitations because the Civil Complaint was filed more than two years after any of these dates.  Therefore, summary judgment will be granted in favor of Chief DiSanti and Lt. Basl as to Counts V and VI.

Because summary judgment will be granted on all of plaintiffs' state tort law claims, we will grant Chief DiSanti and Lt. Basl's motion for summary judgment with respect to Flynn's loss of consortium claim at Count IX.  See discussion supra, Section C.

**E.      Punitive Damages**

Defendants argue that summary judgment should be granted on plaintiffs' claims for punitive damages under the PHRA.  We agree.

It is well-settled that punitive damages are not recoverable under the PHRA. See Robbins v. Phila. Sports Club, 2005 WL 3369157 at *4-5 (E.D. Pa. Dec. 9, 2005) (adopting Supreme Court of Pennsylvania's ruling in Hoy v. Angelone that punitive damages are not available under the PHRA); Hoy v. Angelone, 720 A.2d 745, 751 (Pa. 1998) ("in the absence of express statutory language or any further legislative guidance, we hold that punitive damages are not available under the [Pennsylvania Human Relations] Act."); Snyder v. Bazargani, 241 F. Appx. 20, 23 (3d Cir. 2007) ("We are mindful of the fact that punitive damages are not available under the PHRA.").  Therefore, plaintiffs cannot recover punitive damages pursuant to any claims raised under the PHRA.

For the reasons set forth above, defendants' motions for summary judgment will be granted in part and denied in part.  An appropriate order will follow.

Date: March 29, 2024

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:     Dion G. Rassias, Esquire
        Jason M. Schiffman, Esquire
        Jordan P. Shuber, Esquire
        Thomas E. Breth, Esquire
        Thomas W. King, III, Esquire
        Jon Hogue, Esquire
        (*Via CM/ECF Electronic Mail*)